UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
                          )
       v.                 )          04-CR-10049-WGY
                          )
JUAN CONCE,               )
    Defendant.            )

## SENTENCING MEMORANDUM OF THE UNITED STATES

On June 27, 2004, the defendant pled guilty to the two counts of the Indictment in this case, charging him with conspiracy to distribute cocaine base, also known as "crack cocaine", and distribution of crack cocaine. The Presentence Report ("PSR") prepared by the United States Probation Office, dated August 17, 2004 (and the addendum dated October 13, 2004), correctly sets forth the sentencing guideline range as 262 to 327 months, based on an adjusted offense level of 34 and a Criminal History Category of VI. The sentencing guideline range, as properly noted in the PSR, is based on (1) the drug weight (11 grams of crack cocaine) and (2) the defendant's status as a career offender, within the meaning of U.S.S.G. § 4B1.1, based on the defendant's two prior drug trafficking convictions. Finally, the PSR properly noted that the government filed an Information in this case, pursuant to 21 U.S.C. § 851, and that the defendant is therefore also subject to a 10 year mandatory minimum sentence. The government recommends that the Court sentence the defendant to a term of incarceration of 262 months, representing the low end of the guideline range.

## A.    BACKGROUND

The PSR accurately describes the facts underlying the convictions in this case, which, for convenience, are briefly summarized here.

This case arose from an eighteen-month investigation by the Federal Bureau of Investigation's ("the FBI's") North Shore Gang Task Force into drug trafficking and other suspected criminal behavior in the Lawrence and Lowell, Massachusetts area by members and associates of the Almighty Latin King Nation ("Latin Kings"). Over the course of the investigation, cooperating witnesses ("CW's") working for the FBI made approximately 30 purchases of heroin, cocaine and cocaine base from members and associates of the Latin Kings. All of the purchases (and most of the conversations and negotiations leading up to the purchases) were consensually recorded. Most of the deals also took place in a car equipped with audio and video equipment. The CW's also wore transmitters during most of the purchases. The transmitters enabled law enforcement agents to listen to conversations as they took place.

The investigation also disclosed substantial amounts of information regarding the organization and structure of the Latin Kings. The Massachusetts Chapter of the Latin Kings is a street gang with hundreds of members in Lawrence, Lowell and other cities. The Latin Kings operate local chapters throughout the

2

state including chapters inside many correctional facilities.
Many members of the gang are involved in a broad range of illegal
activities including drug trafficking and crimes of violence
undertaken in furtherance of protecting the interests of the gang
and its members.  The defendant was identified during the course
of the investigation as one of the leaders of the Latin Kings in
Lawrence.  More information regarding the Latin Kings, and the
defendant's role int eh organization, is set forth in the
detention affidavit filed in connection with this case.  See Dkt.
6.

On April 17, 2003, in connection with the Latin King
investigation, a CW working with the FBI made a hand-to-hand
purchase of 11 grams of cocaine base, also known as "crack
cocaine" from the defendant.  The sale, which is accurately
described in the PSR, was surveilled by law enforcement agents
and recorded on audio and video tape.

## B.   THE DEFENDANT'S *BLAKELY* ARGUMENTS

The defendant has made two substantive objections to the PSR
based on Blakely v. Washington, 124 S.Ct. 2531 (2004).  First,
the defendant argues that he cannot be sentenced based on the 11
grams of crack cocaine because "he had a right to have a jury
determine the factual basis for any enhancements beyond a
reasonable doubt."  Defendant's Objections to PSR at 1.  Instead,
the defendant argues that he should be sentenced based on the

3

guideline provision for the minimum amount of crack cocaine (less than 250 mg). Second, the defendant argues that he cannot be sentenced as a career offender because <u>Almendarez-Torres v. United States</u>, 523 U.S. 224 (1998) is "questionable law in light of <u>Blakely</u>." <u>Id.</u> Neither argument has merit.

## 1. **Drug Weight**

<u>Blakely</u> explained that a sentence may be imposed by a judge if it is based solely on the "facts reflected in the jury verdict or admitted by the defendant." <u>Blakley</u> 124 S.Ct. at 2537. At his change of plea hearing, the defendant specifically admitted to selling more than 5 grams of crack cocaine, which implicated the statutory mandatory minimum sentence. Accordingly, the Court may sentence him, consistent with <u>Blakely</u>, based on that express admission. <u>See, e.g.</u>, <u>United States v. Lucca</u>, 377 F.3d 927, 934 (8ᵗʰ Cir.2004); <u>United States v. Giluardo-Parra</u>, 2004 WL 2369936 *2 (D.Utah).[1]  As described below, since the defendant

---

[1] The Eighth Circuit reasoned as follows:

> Lucca was sentenced to a term of 120 months imprisonment, which is the mandatory minimum term of imprisonment established by statute for a defendant who is convicted of trafficking in excess of 500 grams of a mixture or substance containing methamphetamine. 21 U.S.C. § 841(b)(1)(A). Blakely explained that a sentence may be imposed by a judge if it is based solely on the "*facts reflected in the jury verdict or admitted by the defendant*." --- U.S. at ----, 124 S.Ct. at 2537 (emphasis in original). The indictment in this case alleged that Lucca possessed with intent to distribute in excess of 500 grams of methamphetamine, and he admitted this fact as part of his guilty plea. No additional finding was required by the district court to justify the

4

specifically admitted to selling more than 5 grams of crack cocaine, there is no Blakely issue with respect to drug weight.[2]

There was one hand-to-hand buy in this case. The CW, on video, bought 11 grams of crack cocaine from the defendant. At the June 17, 2004 change of plea hearing, the Court -- presumably because of its own, pre-Blakely expressed views regarding the sentencing guidelines -- was exceedingly careful to make it clear to the defendant that he had a right to have the drug weight determined beyond a reasonable doubt and to make it clear that he was pleading guilty to the drug weight.

First, the Court and the government engaged in the following exchange.

> THE COURT:   Help me on one thing.   This wouldn't
> prevent the plea, but my general practice is to seek a
> pre-plea presentence report in each case, each case
> where the quantity of drugs might be a relevant

---

sentence of imprisonment that was imposed pursuant to §
841(b)(1)(A).   Accordingly, Lucca's sentence was consistent
with the Sixth Amendment as interpreted by Blakely and
Apprendi.

Id.

[2] With respect to both counts, the Indictment in this case
specifically charged as follows:

> The Grand Jury further alleges that the offense described
> herein involved at least 5 grams of a mixture or substance
> containing a detectable amount of cocaine base, also known
> as "crack cocaine", a Schedule II controlled substance, in
> violation of Title 21, United States Code, Section
> 841(b)(1)(B)(iii).

Indictment.

5

variable. I did not do so in this case. I'm not clear
why. Has there been any discussion?

MR. LEVITT: There has been discussion, your honor. The
last time we were here we discussed this issue with the
Court. The drug quantity is not an issue in the case.
There is one, one buy of crack cocaine, eleven grams.

THE COURT: That was the answer. And that's all we're going
to see on sentencing?

MR. LEVITT: That's correct.

Transcript of Change of Plea Hearing at 2-3 ("Rule 11 Hearing").[3]

The Court and the defendant then engaged in the following

exchange regarding the charges and the drug weight.

THE COURT: Do you know what you're being charged with?

CONCE: Yes.

THE COURT: Tell me.

CONCE: I'm being charged with selling eleven grams of crack
cocaine.

. . . .

THE COURT : . . . So let's start with that. Selling
eleven grams of crack cocaine. The government has
specifically charged you with selling more than five grams
of crack cocaine. And so what the government has to prove
is that you, knowing what you were doing, sold a substance
which, while it might not have been pure, had more than
trace elements of this chemical substance that we call crack
cocaine. *And they've got to prove beyond a reasonable doubt
that you were selling more than five grams of that
substance. They've got to prove those things to a jury
beyond a reasonable doubt. . . .*

Rule 11 Hearing at 6 (emphasis added).

---

[3] For the Court's convenience, a copy of the transcript of
the Rule 11 Hearing is attached hereto as Exhibit 1.

The government then summarized the facts the government would prove at trial, including the fact that the crack cocaine the defendant sold weighed 11 grams. The defendant did not dispute the drug weight. Since the defendant pled guilty to distributing more than 5 grams of crack cocaine, there is simply no Blakely issue with respect to drug weight.

## 2. **Career Offender**

The defendant also argues that he cannot be sentenced as a career offender because Almendarez-Torres is "questionable law in light of Blakely." Defendant's PSR Objections at 1. Almendarez-Torres remains the law and the defendant provides no legal precedent in support of the contrary.[4]

In Almendarez-Torres v. United States, 523 U.S. 224, 229-48 (1998), the Supreme Court squarely held that facts concerning a defendant's prior convictions need not be presented to the jury even though such facts may enhance a defendant's sentence. The Court stated: "the sentencing factor at issue here -- recidivism -- is a traditional, if not the most traditional, basis for a sentencing court's increasing an offender's sentence." Id. at 243. Blakely does not overrule the Court's decision in Almendarez-Torres. Consequently, Blakely does not prevent the

---

[4] As with the drug weight, the Court carefully ensured at the Rule 11 hearing that the defendant was fully advised, prior to his plea, of the potential sentence he faced as a career offender -- i.e., 262 to 327 months. See Rule 11 Transcript at 12-15.

7

courts from considering the fact of a prior conviction during sentencing.

Since Blakely was announced, several courts have addressed the use of prior convictions during sentencing and have consistently held that a sentencing judge may take prior convictions into consideration when determining a sentence. See, e.g., United States v. Moorer, 2004 WL 2086055, *4 (2004) (reasoning that Blakely applied only to factual determinations and that the defendant's status as a career offender was "purely a matter of law under the Sentencing Guidelines"); United States v. Marseille, 377 F.3d 1249, 1256 n. 14 (11th Cir.2004) ("We have reviewed Blakely and conclude that it is inapposite . . . . [T]hough the district court found that Marseille had prior convictions, Blakely does not take such fact-finding out of the hands of the courts."); United States v. Quintana-Quintana, 2004 WL 2047358, *1 (9th Cir. 2004)(holding that Blakely does not change the prior conviction exception carved out in Apprendi); United States v. Sanders, 377 F.3d 845, 847 n. 3 (8th Cir.2004) ("While the Court [in Blakely] declared unconstitutional any increase in penalty beyond the prescribed statutory maximum based on facts not submitted to a jury and proved beyond a reasonable doubt, the Court expressly exempted 'the fact of prior conviction.'"); United States v. Cooper, 375 F.3d 1041, 1052 n. 3 (10th Cir.2004) (describing Blakely as "reaffirming" Apprendi's

8

exception for the fact of a prior conviction); <u>United States v.</u>
<u>Rodriguez</u>, 2004 WL 2034850, *1 (N.D. Ill. 2004) ("[T]he factor
that set the Sentencing Guideline §4B1.1(A)'s career offender
provision -- and in that regard <u>Blakely</u> (like the <u>Apprendi</u> case
that preceded it) expressly teaches that a defendant's prior
criminal history (the fact that triggered career offender status
for [the defendant]) does not have to be submitted to a jury for
determination."); <u>United States v. Byrd</u>, 2004 WL 1618832, *2
(W.D. Tex. 2004) (<u>Blakely</u> decision did not preclude the court
from finding that defendant was a career offender for sentencing
purposes).

The defendant's argument is thus foreclosed by <u>Almendarez-</u>
<u>Torres</u> and should be denied.

9

## CONCLUSION

For the foregoing reasons, and those set forth in the PSR. the government recommends that the Court sentence the defendant to a term of incarceration of 262 months, representing the low end of the guideline sentencing range.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney,

By:

PETER K. LEVITT
Assistant U.S. Attorney
One Courthouse Way
Boston, MA 02210
(617)748-3355

October 27, 2004

## CERTIFICATE OF SERVICE

I, Peter K. Levitt, do hereby certify that a copy of the foregoing was served this day by fax on counsel for Juan Conce.

Peter K. Levitt

October 27, 2004

10

**1**

1

    UNITED STATES DISTRICT COURT
    FOR THE DISTRICT OF MASSACHUSETTS

2
                                    Criminal No.
3                                   04-10049-WGY

4
    * * * * * * * * * * * * * * *  *
5                                    *
    UNITED STATES OF AMERICA         *
6                                    *
    v.                               *    **CHANGE OF PLEA**
7                                    *
    JUAN CONCE                       *
8                                    *
    * * * * * * * * * * * * * * *  *
9

10

11
            BEFORE:  The Honorable William G. Young,
12                          District Judge

13

14

15  APPEARANCES:

16          PETER K. LEVITT, Assistant United States Attorney,
    1 Courthouse Way, Suite 9200, Boston, Massachusetts
17  02210, on behalf of the Government

18
            HRONES & GARRITY (By Stephen B. Hrones, Esq.),
19  Lewis Wharf - Bay 232, Boston, Massachusetts 02110, on
    behalf of the Defendant

20

21

22

23                                  1 Courthouse Way
                                    Boston, Massachusetts
24
                                    June 17, 2004
25

1      THE CLERK:  All rise.  Court is in session, please

2    be seated.

3          Calling Criminal Action 04-10049, the United

4    States v. Juan Conce.

5          THE COURT:  Good afternoon.  Would counsel

6    identify themselves.

7          MR. LEVITT:  Good afternoon, your Honor.  Peter

8    Levitt on behalf of the United States.

9          MR. HRONES:  Stephen Hrones on behalf of the

10   defendant.

11         THE COURT:  And do I understand that your client

12   is prepared to tender a plea of guilty to these charges?

13         MR. HRONES:  Yes, your Honor.

14         THE COURT:  Help me out on one thing.  This

15   wouldn't prevent the plea, but my general practice is to

16   seek a preplea presentence report in each case, each case

17   where the quantity of drugs might be a relevant variable.

18   I did not do so in this case.  I'm not clear why.

19         Has there been any discussion?

20         MR. LEVITT:  There has been discussion, your

21   Honor.  The last time we were here we discussed this issue

22   with the Court.  The drug quantity is not an issue in the

23   case.  There is one, one buy of crack cocaine, eleven

24   grams.

25         THE COURT:  That was the answer.  And that's all

```
 1    we're going to see on sentencing?

 2              MR. LEVITT:  That's correct.

 3              THE COURT:  I mean, the reason for asking for a

 4    preplea is to protect the defendant and I certainly accept

 5    that representation.

 6              Very well.  Mr. Conce may come forward, or Conce,

 7    may come forward to be inquired of.

 8              THE CLERK:  Right up here, sir.

 9              Sir, would you raise your right hand.

10              Do you solemnly swear that the answers you will

11    give to this Court will be the truth, the whole truth, and

12    nothing but the truth, so help you God?

13              THE DEFENDANT:  Yes.

14              THE CLERK:  Please be seated.

15                          JUAN CONCE

16                     INQUIRY BY THE COURT

17    Q.  Would you state your name, sir?

18    A.  Juan Conce.

19    Q.  Mr. Conce, my name is Bill Young.  I'm the judge who's

20    responsible for presiding in this session of the Court.

21    Now, your attorney says that you desire to plead guilty to

22    these charges against you.  Before I can let you plead

23    guilty there's various things I have to find out.

24              I have to find out that you know what you're

25    doing.  I have to find out that you know what you're
```

1    letting yourself in for, what may happen to you if you

2    plead guilty. I have to find out that you know what you

3    are giving up because you give up things that are very

4    important to you if you plead guilty.

5         I have to find out that you want to plead guilty.

6    Not that you're happy about it, but under the circumstances

7    you have decided that that's what's best for you. Not your

8    attorney, not your family, you have decided that's what's

9    best for you. And then I have to find out that the

10   government has enough evidence that if we go to trial in

11   this case a jury could find you guilty of these charges.

12        To find those things out I ask you questions and

13   then to see if they've got evidence I ask them a question

14   and I ask you if what they tell me is true.

15        If you don't understand some question I'm asking

16   you, you stop me because I have to ask it in a way that you

17   will understand.

18        If, at any time, you want to talk to Mr. Hrones

19   just turn your chair around, I'll step away. That's why

20   he's come to stand by you. You've got the right to talk to

21   him privately.

22        If you plead guilty, I'll be the judge who has to

23   pass the sentence. So, as you listen to all these things,

24   if you decide you would rather not plead guilty, and I'm

25   told there's no plea agreement in this case, and I'll ask

1   about it, then that's fine by me.  If you don't want to

2   plead guilty just tell me, we'll stop and we'll get this

3   case ready for trial.

4           Now, I tell you personally I will never hold it

5   against you, I won't be angry, never hold it against you if

6   you want a trial.  That's one of your rights.

7           Now, I know that these so-called sentencing

8   guidelines, they raise the potential for a lesser sentence

9   if you plead guilty and don't go to trial.  And it's rare

10  that you could get that discount if you went to trial.  But

11  personally, I'll never hold it against you if you want to

12  go to trial.

13          Now, do you understand all those things?

14  A.  Yes.

15  Q.  Let's start with the do you know what you're doing.

16          How old are you, Mr. Conce?

17  A.  Twenty-seven years old.

18  Q.  How far did you go in school?

19  A.  GED.

20  Q.  Have you ever been treated for a mental condition?

21  A.  No.

22  Q.  Are you aware of any mental illness you may have today?

23  A.  No.

24  Q.  Are you taking any drugs today?

25  A.  No.

1   Q.  Taking any medicines of any sort?

2   A.  No.

3   Q.  Under the influence of alcohol?

4   A.  No.

5   Q.  Do you know what you're charged with?

6   A.  Yes.

7   Q.  Tell me.

8   A.  I'm being charged with selling eleven grams of crack

9   cocaine.

10  Q.  Well, I'm sure that's so.  They break it down into

11  three different crimes.

12  A.  Yes.

13  Q.  The government.

14        So let's start with that.  Selling eleven grams of

15  crack cocaine.  The government has specifically charged you

16  with selling more than five grams of crack cocaine.  And so

17  what the government has to prove here is that you, knowing

18  what you were doing, sold a substance which, while it might

19  not have been pure, had more than trace elements of this

20  chemical substance that we call crack cocaine.  And they've

21  got to prove beyond a reasonable doubt that you were

22  selling more than five grams of that substance.  They've

23  got to prove those things to a jury beyond a reasonable

24  doubt.  That's one charge.

25        Now, another charge is similar but it's slightly

1    different. They charge you with conspiracy to distribute

2    crack cocaine. Now, for that one they have to prove

3    something similar but different. They have to prove that

4    you and at least one other person had a deal, an agreement

5    to sell a quantity of cocaine. Two people who, not you and

6    an undercover cop, because he's not a conspirator, you and

7    one other person who shares the same criminal intent have

8    to have a deal. That's the first aspect of conspiracy.

9    And secondly, not just any deal to commit some crime. A

10   deal to distribute, which includes selling it, but it could

11   mean give it away, to distribute crack cocaine. Now, on

12   that one the government doesn't have to prove you did it,

13   but they have to prove you had the deal and that both of

14   the people, or however many there were, agreed, that was in

15   their minds that they would get together, including you,

16   and sell crack cocaine.

17           Do you understand that?

18   A.  Yes.

19   Q.  The government also makes a charge against you of

20   criminal forfeiture, and specifically they're looking for

21   whatever property was obtained, used, as a result of these

22   offenses. And if you plead guilty here it becomes very

23   easy for the government to collect, to take that property.

24           Do you understand that?

25   A.  Yes, your Honor.

1   Q.   Now let's talk about what you give up, let's talk about
2   your rights.

3          You've got a right to a fair and an impartial
4   trial before a jury of the people, not me.  And that jury
5   will be told by me they can't find you guilty until they
6   believe, all of them together believe beyond a reasonable
7   doubt that you committed one or more of these offenses.

8          At that trial you've got a right to confront the
9   witnesses against you.  Which means you can sit right here
10  in the courtroom, you can look at them as they testify.
11  But more than that, you can testify.  Mr. Hrones can ask
12  the witnesses questions, he can call witnesses on your
13  behalf, he can argue on your behalf.

14         You also have a right to be silent, which means
15  you don't have to testify but you can.  You don't have to
16  do anything.  The government made the charges, the
17  government's got to prove the charges.  So you don't have
18  to question witnesses or have him do it.  You don't have to
19  call witnesses.  And to the extent you're silent, I tell
20  the jury they don't hold that against you, they can't,
21  that's, that's unfair.

22         Also, you have the right to be treated as an
23  innocent person.  And I mean innocent here.  Now, I know
24  you're being held in custody awaiting the trial here.  But
25  I don't know anything about you, and mentally I've got to

1    take you as an innocent person.  That's your right.  And

2    I'll tell that to the jury.

3         Now, when I tell you these things I'm not giving

4    you anything.  These are your rights under the law.

5         Do you understand you have those rights?

6    A.  Yes.

7    Q.  Plead guilty and you've given them all up.  No trial.

8    We'll never get to see the evidence.  The closest we'll

9    come, I'll ask the Assistant United States Attorney to tell

10   me what he hopes he could prove.  You'll never get to

11   cross-examine them or challenge them.  Your right to be

12   silent about this crime, once I sentence you that right is

13   gone.  Then the government can call you before a grand jury

14   and ask you about this conspiracy and this particular

15   distribution.

16        Now, if there's other crimes you still have the

17   right to be silent about them.  But these ones you're

18   guilty.  If you plead guilty you no longer have that right

19   to be silent.  And, equally important, you go from being

20   innocent in my mind to being guilty and all that remains

21   then is what sentence I'm going to impose upon you.

22        Do you understand that?

23   A.  Yes.

24   Q.  Now, let's talk about what may happen to you.

25        Whenever congress passes a law they pass with that

```
 1   law a maximum sentence.  No judge can give you more than
 2   the maximum sentence that is carried out in the particular
 3   law.
 4               THE COURT:   In this case the maximum sentences are
 5   what, Mr. Levitt?
 6               MR. LEVITT:   Your Honor, based on the drug
 7   quantity there's a maximum term of imprisonment of 40 years
 8   with a mandatory minimum of five years.
 9               THE COURT:   Twenty on both?  Twenty on each, more
10   precisely.
11               MR. LEVITT:   No, 40 on each.
12               THE COURT:   Forty on each.
13               MR. LEVITT:   Yes.  The maximum is the same for
14   each count.
15               THE COURT:   Thank you.
16               MR. LEVITT:   It's a maximum term of imprisonment
17   of 40 years, a mandatory minimum of five years in prison, a
18   maximum $2 million fine, at least four years of supervised
19   release up to a maximum of life, and a hundred dollar
20   special assessment.
21               THE COURT:   And the drug quantity that you say
22   drives it is a quantity above five grams of crack cocaine
23   and below fifteen grams?
24               MR. LEVITT:   It's below 50.
25               THE COURT:   Below 50.  Thank you.
```

1      MR. LEVITT:  Now, your Honor, there are also, the

2   government has also filed an information pursuant to 21

3   U.S.C., Section 851 based on two prior drug trafficking

4   convictions of the defendant.  If those were found at

5   sentencing by the Court to be prior drug trafficking

6   convictions that would affect the mandatory minimum and the

7   maximum.  The maximum would go to life, the mandatory

8   minimum would go to ten years, the fine, maximum fine would

9   go to $4 million, the supervised release would go to a

10  minimum of eight years, maximum of life, and a hundred,

11  there would still be a hundred dollar special assessment on

12  each charge.

13  Q.  Did you hear what Mr. Levitt had to say?

14  A.  Yes, your Honor.

15  Q.  Do you think you understand it?

16  A.  Yes.

17      THE COURT:  Let me ask you something.  This

18  indictment was returned on February 19th of this year.

19  When did you file that notice under 851?

20      MR. LEVITT:  Your Honor, I don't have that handy.

21  It was, I believe shortly after that time period.

22      THE COURT:  Thank you.

23  Q.  Now --

24      (Whereupon the Court and the Clerk conferred.)

25      THE COURT:  March 24th of this year.  Thank you.

1    Q.    Now, so you understand, the government, in addition to

2    those matters which have just been explained to you, the

3    congress has passed a law called the sentencing guidelines.

4    And that law governs both the maximum and he's talking

5    about minimums here, minimum mandatory sentence here.  And

6    he says that may be as much as ten years.

7              Do you understand that?

8    A.    Yes.

9    Q.    All right.

10              THE COURT:  Now, what's the guideline range --

11    well, I take it that, this indictment was passed down this

12    year, so it's under Feeney.  So what's your position about

13    the third point?  The third level?

14              MR. LEVITT:  Your Honor, it's the government's

15    position that the defendant is entitled to the third point.

16              THE COURT:  If he pleads guilty.

17              MR. LEVITT:  If he pleads guilty, correct.

18              THE COURT:  All right.  So now assume, consonant

19    with the Court's general practice, that if he pleads guilty

20    I award that, what would the guidelines come out to be on

21    the quantity of drugs that it's been represented to me this

22    one buy involved?

23              MR. LEVITT:  Your Honor, based on the quantity of

24    drugs --

25              THE COURT:  Eleven grams; is that right?

```
1              MR. LEVITT:  Eleven grams.  -- and based on the
2     two prior drug trafficking convictions which would in the
3     government's view put the defendant in the career offender
4     category under the sentencing guidelines, the guideline
5     range with the three points would be 262 months to 327
6     months.
7     Q.   Did you hear what Mr. Levitt had to say?
8     A.   Yes.
9     Q.   Do you understand it?
10    A.   Yes.
11    Q.   Now, 262 months, that's nearly 22 years, at the bottom.
12              Do you understand that?
13    A.   Yes.
14    Q.   And it goes up to 327 months.  Do you understand that?
15    A.   Yes.
16              THE COURT:  He takes the position, Mr. Hrones,
17    that Mr. Conce is a career offender.  Is that disputed?
18              MR. HRONES:  Well, based on the present situation,
19    no.  I mean, he does have those two prior convictions.
20              THE COURT:  All right.  And certainly he's not
21    waiving anything, he's not foreclosed, he'll have a
22    thorough sentencing hearing.
23    Q.   But at least based upon what we know now, if you plead
24    guilty here you're looking at nearly 22 or more years in
25    prison.
```

1        Do you understand that?

2    A.   Yes.

3    Q.   Now, I have no plea agreement here and, therefore, I

4    don't know what the government's going to recommend.  I'm

5    going to ask them now.  But they don't have to tell me

6    because this is what we call a straight up plea.  You don't

7    have a deal with the government.  You've come in and said

8    you want to plead guilty and it looks like you'll, if you

9    do, you'll get those three levels off.  But even with the

10   three levels off we're talking, bottom here, about 22 years

11   in prison.

12        Are you clear on that?

13   A.   Yes.

14        THE COURT:  Do you have a recommendation to make,

15   Mr. Levitt?  I do not require it in view of the procedure,

16   but if you do then you will be bound to it and he's

17   entitled to know it.

18        MR. LEVITT:  Yes, your Honor, and I've spoken with

19   Mr. Hrones about this already.  Assuming that the

20   government's calculation of the guidelines range is

21   correct, the government's recommendation will be at the low

22   end of the guideline range.

23        THE COURT:  All right.

24   Q.   Well, in that sense now, that's stated in open court,

25   did you understand that before he said that?

```
1   A.  Yes.

2   Q.  So, in effect, though we don't have a written plea

3   agreement, the government will recommend to me the low end

4   of whatever we come up with as the guideline range.

5           And that's how you understand it?

6   A.  Yes.

7   Q.  You understand that I'm not part of it; that

8   theoretically I could go to the high end of the guideline

9   range.

10          Are you clear on that?

11  A.  Yes.

12  Q.  All right.  Other than what Mr. Levitt just said about

13  what he would recommend and also what he said about they

14  will take the position that if you plead guilty you're

15  entitled to the three levels that take us down to the

16  nearly 22 years, has anyone promised you anything to get

17  you to plead guilty?

18  A.  No.

19  Q.  Has anyone threatened you with anything to get you to

20  plead guilty?

21  A.  No.

22  Q.  Are you covering up for someone else by pleading guilty

23  yourself?

24  A.  No.

25  Q.  Do you know that if you're not a citizen of the United
```

1    States, conviction of these crimes may have the consequence

2    of your being deported from the United States, denied

3    admission under the laws of the United States, denied

4    naturalization under the laws of the United States?

5    A.   Yes.

6    Q.   Have you had enough time to talk this all over with Mr.

7    Hrones?

8    A.   Yes.

9    Q.   Are you satisfied with Mr. Hrones' representation of

10   you?  Has he gotten for you those things which are your

11   rights under the law?

12   A.   Yes.

13   Q.   Do you think he's been a good lawyer for you?

14   A.   Yes.

15   Q.   Do you want to plead guilty?

16   A.   Yes, I do.

17   Q.   Why?

18   A.   Well, because, you know, I would be found guilty from

19   the evidence that they showed me, the tape that they showed

20   me.  And I don't think, you know, if I go to trial I don't

21   think I have a chance of winning.

22   Q.   All right.  Now, I'm going to ask Mr. Levitt to tell me

23   what he hopes to be able to prove in this case.  And you

24   listen because then I'm going to ask you whether those

25   things are in fact true.

1        THE COURT:  Mr. Levitt, briefly.

2        MR. LEVITT:  Your Honor, this case arose from a 18

3   month FBI gang task force investigation in the Lawrence

4   area of the Almighty Latin King Nation.

5        In connection with that investigation, on the

6   evening of April 16th, 2003, a cooperating witness working

7   with the FBI contacted the defendant at a number subscribed

8   to by the defendant's girlfriend, Tasha Fernandez, and the

9   defendant and the cooperating witness discussed, made

10  arrangements for the defendant to sell the cooperating

11  witness crack cocaine on the following day.

12       On the following day the cooperating witness was

13  contacted by a woman who identified herself as the

14  defendant's girlfriend and told the cooperating witness

15  that the defendant was prepared to meet later that day.

16  The cooperating witness asked her to have the defendant

17  call him himself, which the defendant did and repeated that

18  he would be ready to make the sale that evening.

19       At approximately 6:20 p.m. that night the

20  cooperating witness made a consensually recorded call to

21  the defendant.  They agreed to meet at the Walgreens

22  parking lot on Jackson Street in Lawrence.

23       Agents then provided the cooperating witness with

24  recording equipment, a transmitter, and $560 in official

25  government funds.  The agents also provided the cooperating

1    witness with a car with audio video surveillance equipment.

2            The cooperating witness was surveilled to the

3    Walgreens parking lot.  At approximately 7:10 p.m. that

4    evening the defendant arrived in a blue Mazda Protege.  The

5    defendant got into the cooperating witness's car and told

6    him to drive around Lawrence while the crack cocaine was

7    delivered to the defendant's home.

8            They drove in the car for approximately 15

9    minutes.  The conversation they had in that meeting was on,

10   captured on videotape in the car.  The cooperating witness

11   then drove the defendant back to Walgreens.  The defendant

12   got into his own car and they drove to the defendant's

13   house on the corner of Woodland and East Haverhill Streets

14   in Lawrence.

15           Upon arriving the defendant walked up to the

16   driver's side window and the cooperating witness handed him

17   $560 in official government funds and the defendant went

18   inside his house.

19           Shortly thereafter a grey Ford Taurus drove up to

20   the defendant's home and an unidentified Hispanic male got

21   out of the Taurus and walked into the defendant's home.  A

22   few minutes later the defendant and the unknown man came

23   out.  The unknown man got into his car and drove off.  The

24   defendant got into the cooperating witness's car and handed

25   him a clear plastic bag containing crack cocaine.  On

```
 1    videotape they inspected it, discussed it, and then the

 2    defendant got out of the car and went back into his house.

 3             The substance was sent to the DEA laboratory and

 4    tested positive for crack cocaine.  It also field tested

 5    positive for cocaine.  And the DEA lab weighed it at eleven

 6    grams.

 7             THE COURT:  And who -- you say that the girlfriend

 8    and this person who came up in the car, you claim they're

 9    the co-conspirators?

10             MR. LEVITT:  That's correct, your Honor.  I think

11    the evidence, the government submits the evidence is

12    sufficient for the jury to infer that they're

13    co-conspirators.

14    Q.   Did you hear what Mr. Levitt had to say?

15    A.   Yes.

16    Q.   Do you understand it?

17    A.   Yes.

18    Q.   Is it true?

19    A.   Well, not what he says about my girl because she was

20    just answering my phone.

21    Q.   So she didn't know anything about it?

22    A.   No.  They asked for me and she just gave me the phone.

23    Q.   All right.  But you knew what you were doing, you were

24    making a sale of crack cocaine?

25    A.   Yes.
```

1   Q.   And this person who came in the car and left, he

2   brought you the cocaine?

3   A.   No.

4   Q.   Well, who are you -- you say no.

5   A.   No.

6   Q.   Well --

7   A.   The person that came to the house, that was my uncle.

8   Q.   All right.  Fine.  One of the charges you're pleading

9   guilty to here, see, is conspiracy.

10  A.   Yes.

11  Q.   But when I ask you about it I don't hear another

12  conspirator, at least from what you say.  The government

13  says that this all not only looks suspicious, it's more

14  than suspicious and they'll try to put that evidence in

15  before the jury that you conspired with someone.

16         You're telling me, and I'm not judging you now,

17  I'm just trying --

18  A.   Yes.

19  Q.   -- to find out about a plea, you're telling me this was

20  your uncle and wasn't in on any deal?

21  A.   No.

22  Q.   And your girlfriend wasn't in on any deals, all she did

23  was answer the phone?

24  A.   Yes.

25  Q.   Okay.  Now, I can let you plead guilty to conspiracy in

1    essence to get it over with because you're pleading guilty

2    to the charge of the actual sale.  But I'm not hearing that

3    you're guilty of conspiracy.  And if I let you plead guilty

4    to conspiracy, I'm going to take it that you are guilty of

5    conspiracy.

6              Now, do you understand that?

7    A.   Well, from what he's saying and, are you telling me

8    then there was no conspiracy?

9    Q.   Well --

10   A.   Because I did not -- it didn't happen that way.

11   Q.   Well, do you want to plead guilty to that count, Count

12   1, the conspiracy or not?  It's not for me to say.  And if

13   you tell me you do I'm going to say why do you?

14             Now, I can think of reasons.  If you go to trial

15   on the conspiracy -- well, it's not for me to advise you.

16   Mr. Hrones will advise you.

17             But I'm not hearing any agreement that you're

18   guilty of conspiracy.  I'm hearing an agreement that you're

19   guilty of Count 2, distribution of cocaine base, eleven

20   grams.

21             And let's start there.  I mean, that's true?  You

22   are, right?

23   A.   Yes.

24   Q.   You understand you're guilty of that?

25   A.   Yes.

1   Q.  Well, do you think you're guilty of conspiracy?  I
2   mean, the cocaine didn't just come out of the air.  So was
3   someone else in on this deal to sell it?
4   A.  Well, that's something that I already had.  Nobody
5   brought it to me.  They think that somebody dropped it off
6   and, the person that got out of the car.
7   Q.  Well, here's what we are going to do.  Take a moment
8   and talk to Mr. Hrones.
9   A.  Yes.
10  Q.  Because it's not for me to advise you.
11          THE COURT:  I'll let him plead guilty, Mr. Hrones,
12  if he comes to believe it's in his best interest to get
13  this over.  On the other hand, I'm not hearing any
14  acknowledgement that there's a conspiracy and maybe there
15  wasn't.  Maybe the government would drop that and just go
16  for the distribution.  Maybe a lot of things.  Why don't we
17  take a moment.
18          MR. LEVITT:  Your Honor, there is, there is one
19  fact that I mentioned in my recitation.
20          THE COURT:  That I haven't picked up on, so go
21  ahead.
22          MR. LEVITT:  But it's relevant, I think.  That
23  when the defendant and the cooperating witness first got
24  together the defendant told the cooperating witness to
25  drive around which they did for 15 minutes while the crack

1    cocaine was delivered to his home.  So, even if this wasn't

2    the person who delivered it, the inference is that there is

3    some unknown person out there who delivered it.

4              THE COURT:  Okay.

5    Q.   Now, he says he can prove that.

6    A.   Yes.

7    Q.   And, in fact, is that what happened?  You drove around?

8    A.   Yeah, that's what I told him.

9    Q.   And was that true or was that just a lie?

10   A.   I lied to him because I didn't want him to know that I

11   had the stuff in my house.

12             THE COURT:  Okay.  Well, Mr. Hrones, take a moment

13   and talk to your client.  Again, it's entirely his

14   determination and maybe --

15             MR. HRONES:  Well, let me talk to the U.S.

16   Attorney.

17             THE COURT:  That's fine.

18             (Whereupon counsel conferred.)

19             MR. HRONES:  If I could just speak to him.

20             THE COURT:  Yes, of course you could.

21             (Whereupon Mr. Hrones and Mr. Conce conferred.)

22             (Whereupon counsel conferred again.)

23             (Whereupon Mr. Hrones and Mr. Conce conferred

24   again.)

25             MR. HRONES:  We're all set, your Honor.

```
1    Q.   Have you had enough time to talk to Mr. Hrones,
2    Mr. Conce?
3    A.   Yes, your Honor.
4    Q.   Now, what passes between you and him is private and I
5    have no right to ask about it.  But you tell me what you
6    want to do here.
7         Do you want to plead guilty or something else?
8    A.   I'm going to plead guilty.
9    Q.   Now, I take it that's because you think that if you
10   plead guilty to this and you plead guilty to the
11   distribution, sentence is pretty much going to be the same.
12        Is that right?
13   A.   Yes.
14   Q.   Okay.  That's what I think, too.  And we'll understand
15   that if it didn't work out that way I'm going to take a
16   fresh look at this.  Because I think in fairness to
17   Mr. Conce, he's, he's denying it, but he's, I'm going to
18   take this as an Alford plea, he's prepared to go forward
19   because he doesn't want to run the risk of trial, he wants
20   to get the three point reduction, and he doesn't think he's
21   going to be subjected to a more severe sentence.
22        I'm not putting words in your mouth.  Is that
23   right?  Is that really why you're doing this?
24   A.   Yes, your Honor.
25   Q.   Okay.
```

```
 1              THE COURT:  All right.  I find that Mr. Juan Conce

 2    knowingly, intelligently and voluntarily exercises his

 3    right to plead guilty.

 4              There is one other question just so we're all

 5    clear.  What actually are you looking for in the

 6    forfeiture, Mr. Levitt?  The indictment doesn't make clear.

 7              MR. LEVITT:  There's no property that's been

 8    identified to date, your Honor.  I don't anticipate there

 9    will be any property.

10    Q.  But the way the law works, if they can find anything of

11    yours that really was used to facilitate this drug deal,

12    then the government can get it, it can be forfeited.

13              Do you understand that?

14    A.  Yes, your Honor.

15    Q.  So when you plead guilty to the crimes, conspiracy and

16    distribution, you're increasing your risk that if they find

17    anything that, one, is yours and is either the proceeds of

18    this drug deal, or two, was used to facilitate this drug

19    deal, they can go after it, the government can go after it

20    and take it.

21              Do you understand that?

22    A.  Yes.

23              THE COURT:  All right.  I find he knowingly,

24    intelligently and voluntarily exercises his right to plead

25    guilty.  The clerk may accept the plea.
```

1    Q.   Now, this is the key point.  She's going to ask you,

2    she'll say you've previously pleaded not guilty, do you now

3    want to plead guilty.  If you want to plead guilty say yes.

4    If you want to stop say no.  Then she'll say how do you

5    plead.  If you plead guilty when she asks you then you're

6    guilty.  There's no taking it back, no starting over.

7         Do you understand?

8    A.   Yes.

9         THE COURT:  The clerk may accept the plea.

10        THE CLERK:  Juan Conce, you have previously

11   pleaded not guilty to an indictment charging you with

12   violating 21 U.S.C., Section 846, conspiracy to distribute

13   cocaine base, and 21 U.S.C., Section 841(a)(1),

14   distribution of cocaine base.

15        Do you now want to change your plea from not

16   guilty to guilty?

17        THE DEFENDANT:  Yes.

18        THE CLERK:  What say you now to Counts 1 and 2,

19   guilty or not guilty?

20        THE DEFENDANT:  Guilty.

21        THE COURT:  Thank you.  You may step down.

22        THE DEFENDANT:  Thank you.

23        (Whereupon the defendant stepped down.)

24        THE COURT:  I propose sentencing at 2:00 p.m. on

25   September 21st.  Is that satisfactory, Mr. Levitt?

1          MR. LEVITT:  Yes, it is, your Honor.

2          THE COURT:  Mr. Hrones?

3          MR. HRONES:  Let me check my calendar.  What time

4     is that?

5          THE COURT:  2:00 p.m.

6          MR. HRONES:  On the 21st?

7          THE COURT:  Correct.

8          MR. HRONES:  Yes, that's fine, your Honor.

9          THE COURT:  Mr. Conce is going to be remanded.  So

10    can I ask you, Mr. Hrones, if you won't go to probation

11    right now, tell them of these changed circumstances so they

12    may prepare a presentence report.

13         MR. HRONES:  All right.

14         THE COURT:  Thank you very much.  Thank you both.

15    He is remanded to the custody of the marshals.  We'll set

16    up for the next case.

17         MR. LEVITT:  Thank you, your Honor.

18         (Whereupon the matter concluded.)

19

20

21

22

23

24

25

1                    **C E R T I F I C A T E**

2

3          I, Donald E. Womack, do hereby certify that the

4    above proceedings were reported by me stenographically and

5    this transcript represents a true and accurate

6    transcription of said proceedings.

7

8

9                    _____

10                        DONALD E. WOMACK
                         Official Court Reporter
11                          P.O. Box 51062
                     Boston, Massachusetts 02205-1062
12                      womack@megatran.com

13

14

15

16

17

18

19

20

21

22

23

24

25